In re Lawrence E. HAMILTON, Jr., SS# 347–32–4363, Debtor.

Jeffrey A. WEINMAN, Chapter 7 Trustee for Lawrence Edward Hamilton, Jr., Plaintiff

v.

HAMILTON PROPERTIES CORPORATION, Defendant.

Bankruptcy No. 93–12927 SBB.

Adv. No. 95–1269 CEM.

United States Bankruptcy Court, D. Colorado.

Sept. 20, 1995.

Krista A. Landerholm, Douglas W. Jessop, Holden & Jessop, P.C., Denver, CO, for plaintiff Jeffrey A. Weinman, as Chapter 7 Trustee for the Estate of Lawrence Edward Hamilton, Jr.

F. Brittin Clayton, III, Clayton and Stone, L.L.C., Boulder, for defendant Hamilton Properties Corporation.

## ORDER ON DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

CHARLES E. MATHESON, Chief Judge.

The Hamilton Defendants' Motion to Dismiss and for Summary Judgment, with Mem-

orandum Brief ("Motion") is before the Court. The Motion was filed as a responsive pleading to the complaint filed in this case by Jeffrey A. Weinman, Trustee of the Chapter 7 estate of Lawrence E. Hamilton, Jr. ("Trustee").

The caption of the complaint signals the scope of the relief requested. It is titled: "Complaint to 1) Recover Fraudulent and Preferential Transfers, 2) Allow Reverse Equitable Piercing of Hamilton Properties Corporation and Find Such Entity to be an Alter Ego of the Debtor and 3) Require Turnover of Property and an Accounting ("Complaint"). In the Complaint as it now stands,[1] the Trustee requests a determination that Hamilton Properties Corporation ("HPC" or "Defendant") is the alter ego of Lawrence E. Hamilton, Jr. ("Debtor" or "Hamilton") and he seeks to pierce HPC's corporate veil and appropriate its assets as assets of the estate of the Debtor. In addition, predicated on the allegation that HPC is the alter ego of the Debtor, he demands turnover and an accounting from HPC for the use of assets of the estate. Finally, he asks that an assignment of rent from the Debtor to HPC be set aside as a fraudulent transfer under state law.

The Court issued a procedural order on the Motion setting response and reply times.[2] Defendant's Reply in Support of Motion to Dismiss and for Summary Judgment ("Defendant's Reply") was filed with the Court on August 15, 1995 and, thus, the matter is ripe for determination.

The claims for relief in the Complaint which seek redress as to HPC are the Sixth [Reverse Equitable Piercing of HPC and Finding of Alter Ego Status of HPC Pursuant to 11 U.S.C. §§ 105(a), 541 and 704(1) ]; Seventh [Turnover and Accounting of all Property of the Debtor's Estate Held by HPC Pursuant to 11 U.S.C. § 542(a) ]; Eighth [Fraudulent Transfer of Rent Payments Pursuant to 11 U.S.C. § 544 and Colo, Rev.Stat. §§ 38–8–105(1)(a) and 38–10–117]; and Ninth [Fraudulent Transfer of Rent Payments Pursuant to 11 U.S.C. § 544 and Colo. Rev.Stat. § 38–8–105(1)(b) ].

The Motion seeks to resolve the Sixth and Seventh Claims for Relief, (the "Alter Ego/Reverse Piercing Claims"), in part, via a motion to dismiss that they fail to state a claim upon which relief can be granted, and in part, via a motion for summary judgment. Specifically, HPC argues, resting exclusively on the facts in the Complaint, that the Trustee does not have standing to bring an alter ego claim and that the "reverse piercing" theory is simply not legally sustainable. To the extent HPC relies on facts outside the pleadings as to these claims for relief, HPC has presented supporting affidavits. HPC also argues that the Trustee is collaterally estopped from asserting that the Debtor and HPC are alter egos because the Trustee unsuccessfully litigated that issue in the bankruptcy case of Fidelity Escrow Limited Company (93–13255 DEC), a company formed by the Debtor in 1991. Finally, HPC contends that these claims are time barred by the state law statute of limitations.

As to the Eighth and Ninth Claims for Relief (the "Rent Assignment Claims") HPC raises the section 546 statute of limitations as a defense. In addition, HPC maintains that the claim is without merit because the transfers were "reversed" by repayment.

■ When reviewing a motion to dismiss, the Court must "assume as true the facts asserted in the complaint and construe the well-pleaded allegations in favor of the plaintiff." *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1566 (10th Cir.1993). Dismissal is inappropriate unless the plaintiff can prove

---

**1.** The Complaint was originally brought against multiple Defendants for different causes of action. The Court issued an order to show cause to the Plaintiff as to why the Defendants other than Hamilton Properties Corporation ought not be dismissed as having been improperly joined. At a hearing on the order to show cause the Court concluded that it was appropriate to sever all Defendants other than Hamilton Properties Corporation. The Trustee has since filed separate adversary proceedings against those Defendants.

**2.** Because the motion was filed in response to the Complaint, it addresses various claims for relief as to all Defendants. In light of the order severing all Defendants except HPC, the procedural order also limited the issues to be argued to the claims against HPC only.

no set of facts in support of his claims to entitle him to relief. *Dababneh v. F.D.I.C.*, 971 F.2d 428, 432 (10th Cir.1992), *citing Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1473 (10th Cir.1990). In fact, recently, the Tenth Circuit Court of Appeals again acknowledged that "the Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Maez v. Mountain States Tel. and Tel. Inc.*, 54 F.3d 1488 (10th Cir. 1995) *citing Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir.1986).

The standard for the granting of summary judgment has been enunciated by the Tenth Circuit as follows:

> Summary judgment is appropriate when the materials submitted to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." What facts are material depends on the substantive law being applied. Although we view the evidence in the light most favorable to the party opposing summary judgment, disputes about immaterial facts will not preclude summary judgment. Should a non-moving party make some showing on a material issue, we must consider the standard of proof in the case (here, a preponderance of evidence) and decide whether the showing is sufficient for a reasonable trier of fact to find for the non-moving party on that issue. A scintilla of evidence in favor of the non-moving party is not enough to preclude summary judgment. Moreover, should a non-moving party not make a sufficient showing on any essential element of his case, all other facts are rendered immaterial, and summary judgment is appropriate. *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir.1989) (citations omitted.)

See also, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Windon Third Oil & Gas v. Federal Deposit Insurance Corp.*, 805 F.2d 342 (10th Cir. 1986).

■ Since the *Kaiser–Francis Oil* case, the Tenth Circuit elaborated upon the nature and purpose of summary judgment and the showing the non-moving party must make. In *Brown Mackie College v. Graham*, 981 F.2d 1149 (10th Cir.1992), the court emphasized that "the dispute about a material fact must be genuine, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' ... This inquiry ... 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits'." *Id. at 1151, citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986). Most recently, the Tenth Circuit has spoken to the nature of the evidence which must be presented. *See Thomas v. International Business Machines*, 48 F.3d 478 (10th Cir. 1995). In that opinion, the court underscored the requirements of Fed.R.Civ.P. 56(e) that the "affidavits presented must be made on personal knowledge, shall set forth facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein." Generalized unsubstantiated, non-personal affidavits are insufficient to oppose a motion for summary judgment and hearsay may not be used. *Id.*

■ Consequently, in reviewing a motion for summary judgment, the inquiry must commence with a review of both the supporting and opposing affidavits. Thereafter, the Court must analyze whether a dispute exists as to a material fact and whether that dispute is genuine. Prior to delving into the issues raised by the motion for summary judgment portion of the Motion and because HPC has moved to dismiss the Alter Ego/Reverse Piercing Claims for failing to state a claim upon which relief can be granted, the Court must look to the Complaint and what allegations of fact are contained therein.

Viewing the Complaint in a light most favorable to the Plaintiff, the well pleaded allegations of the Complaint establish the following:

1. HPC is a Colorado corporation formed in 1976. The registered agent to receive process for HPC is the Debtor, Lawrence E. Hamilton.

2. Jane M. Hamilton ("Jane"), who resides in Denver, is the Debtor's daughter and Lawrence E. Hamilton, III ("Ted"), who resides in Texas, is the Debtor's son.

3. The Debtor filed his petition under Chapter 7 of the Code on March 19, 1993.

4. The Debtor formed HPC in 1976 for the purpose of operating a real estate development business. Debtor was appointed a director and was elected as the President of HPC at the time of formation.

5. Upon information and belief, at all times since the creation of HPC, the Debtor has been an authorized signatory on the corporate bank account.

6. The Debtor initially owned 100% of the stock of HPC. Shortly after it was formed, the Debtor purportedly gifted 49% of his HPC stock to his children, Jane and Ted, but the Debtor retained control over the stock as the children's trustee.

7. HPC, through the Debtor, applied for a corporate real estate broker's license in 1979. Subsequently, through HPC, the Debtor began to develop his real estate development business.

8. By 1986, the Debtor had developed a successful real estate business through HPC. At that time, the Debtor valued his stock interest in HPC at $135,000.

9. During the mid–1980's, the Debtor began experiencing financial difficulties. The Debtor began to default on a number of bank loans for real estate developments that he had personally guaranteed and began to fall behind in payments to a variety of creditors.

10. The Debtor's bankruptcy schedules reveal that by 1987, a number of creditors had obtained judgments and settlements against the Debtor including, *inter alia,* the following:

   (a) 1986 litigation settlement for $25,000.00 to National Advertising Co.;

   (b) 1986 judgment for $34,757.56 to Rice & Company;

   (c) 1986 judgment for $13,965.75 to Dale W. Claus;

   (d) 1987 judgment for $104,000.00 to Ames Construction, Inc.;

   (e) 1987 judgment for $104,000.00 to Centric–Nucon Corporation;

   (f) 1987 judgment for $36,734.50 to Kaye Construction, Inc.;

   (g) 1987 judgment for $328,338.61 to Colorado National Bank;

   (h) 1987 judgment for $20,698.72 to Sherman & Howard;

   (i) 1987 judgment for $30,688.00 to Merrick & Co.; and

   (j) 1987 judgment for $79,887.30 to Chancery National Bank.

11. In January 1987, in an attempt to stymie the demands of his personal creditors, the Debtor transferred the remaining 51% of his HPC stock ("HPC Stock") to his children.

12. Twenty-five and one-half percent (25.5%) of the HPC Stock, worth at least $67,500.00, purportedly was transferred to Jane in January 1987, concurrently with a transfer to Ted of the remaining 25.5% of the HPC Stock (the "Stock Transfers"). The Debtor received no consideration in exchange for these Stock Transfers.

13. Ted and Jane each currently own 50% of the stock of HPC. The Debtor, however, exercises complete dominion and control over all aspects of HPC's operations. Both before and after these transfers of stock, the Debtor controlled all long-term and day-to-day operations of HPC.

14. Jane, a 50% shareholder, director and officer of HPC, had minimal input into the business and operations of HPC.

15. Upon information and belief, Ted also had minimal input in or connection with the business operations of HPC.

16. All business decisions concerning HPC were, and are, made by the Debtor and virtually all proceeds from HPC's operations have inured to the Debtor's benefit, rather than to the benefit of its shareholders.

17. The Debtor so completely dominates the finances, policies and business practices of all aspects of HPC's operations, that HPC does not have existence separate from the Debtor.

18. The Debtor has used his pervasive control of HPC to fraudulently transfer his

personal assets to related people and companies, including the Baby Doe's Transfer and the Brittany Hill Transfer, with the intent of protecting his assets from personal creditors.

19. Over the life of HPC, Jane and Ted, first as the 49% shareholders and after 1987 as 100% shareholders, each received only $1,500.00 as dividends from HPC.

20. The Debtor received no dividends from HPC but, from 1983–1993, was paid a salary by HPC as follows:

| 1983 | $ 94,856 | 1988 | $ 3,200 |
|------|----------|------|---------|
| 1984 | $ 31,500 | 1989 | $    0 |
| 1985 | $ 24,000 | 1990 | $    0 |
| 1986 | $156,000 | 1991 | $69,000 |
| 1987 | $ 12,000 | 1992 | $12,500 |

21. There is a substantial identity of interest between the Debtor and HPC and the Debtor always has been in direct, daily domination and control of HPC's operations.

22. The Debtor's personal finances and the finances of HPC were not separated and HPC's assets were utilized on a number of occasions to pay the Debtor's personal and living expenses.

23. The Debtor acted as if, and stated publicly that, he was the 100% owner of HPC.

24. The Debtor also used HPC to design collusive foreclosures of valuable properties owned by the Debtor personally. The properties were foreclosed by a company created by the Debtor, which company ultimately was acquired by HPC for virtually no consideration.

25. In 1978, the Debtor personally acquired a 100% ownership interest in the real estate under the Denver Baby Doe's Restaurant ("Baby Doe's Property") from Index Companies, Inc. ("Index"). In this transaction, Index also assigned its interest as lessor of the Baby Doe's Property ("Baby Doe's Lease") to the Debtor.

26. The Baby Doe's Lease provided for rent payments to the Debtor of the greater of $2,000.00 per month or 2% of the Restaurant's gross sales, subject to escalation factors in the lease.

27. From 1987 to 1992, the Debtor's personal financial situation continued to deteriorate and the following additional creditors obtained judgments against the Debtor:

(a) 1989 judgment for $75,000.00 to Specialty Restaurants Corp.;

(b) 8/15/91 judgments for $475,681.44 and $100,935.48 to Bank Western; and

(c) 1992 judgment for $83,314.00 to Colorado National Bank.

28. These judgments, in addition to those delineated above, put the Debtor's ownership interests in both the Baby Doe's Property and the Brittany Hill Property at risk.

29. Unbeknownst to the Debtor's creditors, however, the Debtor had caused HPC to enter into an option agreement with the foreclosing company. This option agreement allowed the Debtor, through HPC, to retain control of the Baby Doe's Property and the Brittany Hill Property at any time.

30. The Baby Doe's Property was subject to three encumbrances: a) National Traveler's Life Insurance Company ("National Traveler's") held a first lien on the property secured by a deed of trust on the Baby Doe's Property; b) Lorraine Hamilton, the Debtor's ex-wife, held a second lien on the property secured by a deed of trust on the Baby Doe's Property and a deed of trust on the Brittany Hill Property; and c) the FDIC held a third lien, which also was secured by a deed of trust on the Baby Doe's Property.

31. In June 1991, the Debtor created Security Asset Management ("Security"), a Colorado limited liability company, for the purpose of purchasing the note and deed of trust comprising National Traveler's first lien on the Baby Doe's Property.

32. The Debtor, through HPC, advanced funds to Security for the purchase of National Traveler's lien and Security purchased the lien for $89,000.00.

33. After this purchase, Security, as a friendly creditor controlled by the Debtor through HPC, commenced foreclosure proceedings on the Baby Doe's Property ("Baby Doe's Transfer").

34. In November 1991, the Debtor formed Fidelity, another Colorado limited liability company.

35. At the time Fidelity was formed, an option agreement was entered into between HPC and Fidelity whereby, for a thirty-year period, HPC had the option to purchase the outstanding membership shares of Fidelity for $100.00, upon written demand and notice.

36. The nominal consideration required under the option agreement gave HPC the right to obtain a 97% stake in Fidelity at any time convenient for a transfer of ownership.

37. On December 31, 1991, Security merged with Fidelity. Fidelity, through HPC, paid the Debtor's ex-wife $22,500.00 for her second lien and deed of trust on the Baby Doe's Property and her first lien and deed of trust on the Brittany Hill Property.

38. In December 1991, the FDIC, the third lienholder on the Baby Doe's Property, redeemed its note for $175,000.00. During the foreclosure, Fidelity purchased the FDIC's note.

39. Consequently, as of January 1992, the Debtor, through two companies controlled and funded by HPC, had redeemed the first, second and third liens on the Baby Doe's Property and had purchased the first lien on the Brittany Hill Property.

40. After Fidelity's foreclosure on the Baby Doe's Property was completed in 1992, Fidelity renegotiated the Baby Doe's Lease with 2520 Restaurant Limited Liability Company, the operator of the Denver Baby Doe's Restaurant. Pursuant to the new lease terms, Fidelity was to be paid monthly rent of seven percent (7%) of the restaurant's gross sales, or approximately $14,000.00–15,000.00 per month.

41. The Baby Doe's Property, including the Baby Doe's Lease, currently is believed to be worth approximately $725,-000.00.

42. Fidelity foreclosed on the Debtor's interest in the Brittany Hill Property in 1992 ("Brittany Hill Transfer"). Fidelity currently is the joint beneficiary of the lease payments made by the lessee of this property.

43. In November 1992, HPC, through the Debtor, exercised its option to purchase a 97% interest in Fidelity for $100.00.

44. On February 6, 1991, the Debtor assigned to HPC his right to receive $2,500.00 monthly net rent ("Rent Transfer") from the Baby Doe's Lease. This rent was to be paid to the Debtor pursuant to an Agreement of Settlement with Specialty Restaurants Corporation ("Specialty"), relating to Specialty's garnishment of the Debtor's right to rent payments under the Baby Doe's Lease.

45. The Debtor's assignment of rent to HPC recited that the transfer was made in consideration of $10.00 and other good and valuable consideration.

46. An Addendum also was executed by the Debtor, allegedly on February 6, 1991, which states that the consideration for the Rent Transfer was HPC's assumption and agreement to pay the Debtor's liability to Columbia Savings & Loan Association ("Columbia") for foreclosure deficiencies totalling $103,392.23.

47. HPC ultimately collected $25,000.00 from the Debtor pursuant to the Rent Transfer.

48. Shortly after the February 6, 1991 Rent Transfer, HPC settled the deficiency claims with Columbia for $5,000.00. Consequently, HPC reaped a $20,000.00 benefit from the Rent Transfer at the expense of the Debtor's creditors.

49. At the time of the Debtor's Rent Transfer to HPC, various creditors had claims against the Debtor.

50. The Debtor made the Rent Transfer to HPC with actual intent to hinder, delay, or defraud creditors of the Debtor.

51. At the time of the Rent Transfer, the Debtor was insolvent.

52. At all times relevant hereto, HPC was an insider of the Debtor within the meaning of section 101(31) of the Bankruptcy Code.

53. The Debtor continued to control HPC after he made the Rent Transfer.

54. HPC knew of the Debtor's intent to hinder, delay, or defraud creditors by making the Rent Transfer.

55. The Debtor made the Rent Transfer to HPC without receiving reasonably equivalent value in exchange for the transfer.

56. At the time of the Rent Transfer, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

### ALTER EGO/REVERSE PIERCING CLAIMS

■ In the context of a motion to dismiss, the Court's charge in reviewing the allegations recited above is to assume them as true and construe them in favor of the Plaintiff and, upon so doing, determine whether Plaintiff can prove any set of facts which would entitle him to relief. The Court has done so and must conclude that the Sixth and Seventh Claims for Relief must be dismissed.

■ The first issue raised by HPC may be quickly disposed of. HPC first asserts that the Trustee does not, as a matter of law, have standing to bring this "alter ego" cause of action. HPC relies for authority on the decision of the district court in *In re M & L Business Machine Co., Inc.*, 136 B.R. 271, 275–278 (Bankr.D.Colo.1992), *aff'd*, 160 B.R. 850, 851 (D.Colo.1993). In the context of a motion to dismiss, this argument is without merit. Regardless of the precise legal theory proffered in support of a set of facts, if the facts state some claim for relief, even if other than that framed by the Plaintiff, the court may not dismiss the complaint. *See e.g. Evans v. McDonald's Corp.*, 936 F.2d 1087 (10th Cir.1991). Thus, if the Trustee pleads some set of facts which form a basis for relief, he has standing to pursue it.

Moreover, as the Plaintiff points out, *M & L* is distinguishable. There, the classic alter ego theory was being pursued. The plaintiffs in a state court proceeding, which the trustee sought to stay, were suing the principals of the corporation in which they had invested alleging that the corporate principals were the alter egos of the corporation and that they should be held accountable for the injuries suffered by the plaintiffs. The court's analysis turned on the question of who at state law could bring the claim. "In Colorado, an action to pierce the corporate veil belongs to the creditors of the corporation not to the corporation itself." *Id.* at 278. Thus, the bankruptcy trustee for the corporation could not bring the claim.

HPC attempts to reduce the holding of *M & L* to a rule of law that the trustee in bankruptcy has no standing to bring alter ego claims. But that effort overstates the holding and ignores the facts out of which *M & L* arose. This Court simply cannot and will not accept such a sweeping over-statement of the law and dismiss the Complaint. Standing to bring the claim is not the issue.

Here, the Trustee is the trustee of the principal's estate, not the corporation's estate, and he endeavors to "pierce the veil of the corporation" to reach the assets of the corporation. His premise is that the corporation is the alter ego of the individual and, as an adjunct to that theory, the Trustee seeks to "reverse pierce" the veil of the corporation for the benefit of the principal's creditors. A review of Colorado law on the traditional "alter ego" and "piercing the corporate veil" theory is instructive. "The alter ego doctrine is a means by which creditors may hold stockholders liable for corporate obligations." *Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1262 (10th Cir.1989) citing *Rosebud Corp. v. Boggio*, 39 Colo.App. 84, 561 P.2d 367, 371 (1977). The Tenth Circuit in *Lowell* also quoted the Colorado Supreme Court which expounded on that doctrine.

Generally, a corporation is treated as a legal entity separate from its shareholders, thereby permitting shareholders to commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debts. Krendl & Krendl, *Piercing the Corporate Veil: Focusing The Inquiry*, 55 Den.L.J. 1

(1978). When, however, the corporate structure is used so improperly that the continued recognition of the corporation as a separate legal entity would be unfair, the corporate entity may be disregarded and corporate principals held liable for the corporation's actions. *Id.* at 2. Thus, if it is shown that shareholders used the corporate entity as a mere instrumentality for the transaction of their own affairs without regard to separate and independent corporate existence, or for the purpose of defeating or evading important legislative policy, or in order to perpetrate a fraud or wrong on another, equity will permit the corporate form to be disregarded and will hold the shareholders personally responsible for the corporation's improper actions. (Citations omitted). *Id. citing Micciche v. Billings,* 727 P.2d 367 at 372–373 (Colo. 1986).

The Trustee's claims for relief and the facts upon which they are predicated certainly do not fall within the framework described above. The Trustee recognizes that and that recognition is apparent in his caption where he requests "reverse piercing." The Tenth Circuit, in *Cascade Energy and Metals Corp. v. Banks,* 896 F.2d 1557 (10th Cir.1990), was confronted with this anomaly of the alter ego theory. *Cascade Energy* involved a dispute between the mine's principal promoters and a group of investors over a gold mine. The investors prevailed in the district court which held that the promoter and his affiliated corporation, the managing agent for the joint venture, breached fiduciary duties owed to the venture. In addition the district court, on separate grounds, "reverse pierced" the veils of related entities of the promoter. The Tenth Circuit reversed on the alter ego and reverse piercing theory. The Tenth Circuit elaborated:

We believe that a Utah court would not reverse pierce the entity veils of (the four entities) for a variety of reasons. First, corporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities. (Citations omitted) ... Second, this case largely involves "reverse" piercing, and it is far from clear that Utah has adopted the doctrine of "reverse" piercing, much less this particular variant of "reverse piercing." ... **The reverse-pierce theory presents many problems. It bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets. Moreover, to the extent that the corporation has other nonculpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly.** In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter ego are subject to attachment. *See* 1 Fletcher Cyc. Corp. § 41.20 at 413 (1988 Supp.) ("A necessary element of the alter ego theory is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege—the doctrine cannot be applied to prejudice the rights of an innocent third party.") **Absent a clear statement by the Supreme Court of Utah that it has adopted the variant reverse piercing theory urged here upon us, we are inclined to conclude that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.** *Id.* at 1576–1577 (emphasis added).

As HPC urges, the Tenth Circuit casts doubts on the viability of the reverse piercing theory but, more importantly, recognizes that federal courts may apply it only if the law of the state which obtains has accepted the theory. HPC found no authority in Colorado in support of such a theory and neither did the Trustee. At best, the Trustee cited two cases in which the Tenth Circuit, in fact, "reversed pierced" a corporate veil to reach the assets of a corporation. Neither is

dispositive nor persuasive. The cases predate *Cascade* by a substantial number of years and Colorado law applies to only one, *Fitzgerald v. Central Bank & Trust Co.*, 257 F.2d 118 (10th Cir.1958). In that case, the court rather blindly applied traditional alter ego theory analysis without confronting the fact that it was reaching the assets of the corporation because of the fraud or injustice on the part of the president. It never explicitly addressed the concept of reverse piercing or whether Colorado had adopted such a theory. Thus, the better view is that articulated more recently by the Tenth Circuit in *Cascade* and that is the law by which the Court is bound.

The reverse piercing theory is an aberration which, if invoked, would prejudice not only the nonculpable shareholders, as the Tenth Circuit intimates in *Cascade,* but also the rightful creditors of the corporation whose assets are subsumed for the benefit of the creditors of the individual. What of the creditors of HPC who relied on its separate corporate existence in doing business with it? They would be left without any assets to satisfy their rightful and superior claims. The Trustee in effect urges a "dissolution" of HPC without the protections, either procedural or substantive, afforded to its creditors by the Colorado Business Corporation Act. See C.R.S. §§ 7–114–106, 107 and 108. Pursuant to those sections, claimants, known and unknown, would be entitled to notice of the dissolution and an opportunity to pursue their claims. In the event assets were distributed to shareholders, the statute permits a claimant, when there are insufficient corporate assets to satisfy his claim, to pursue the shareholders for his pro rata share of the value of assets distributed. C.R.S. § 7–114–108. The remedy sought by the Trustee also raises significant "due process" concerns as regards the interests of any creditors of HPC who may have dealt separately with that entity. *See In re Auto–Train Corp., Inc.,* 810 F.2d 270 (D.C.Cir.1987). In addition, and without conceding the viability of the reverse piercing theory, which is dubious, it and the alter ego theory are equitable remedies which must be sparingly invoked and, as is true of all equitable remedies, only when there is no adequate remedy at law.

Against this backdrop, this Court views the Complaint and the allegations therein. Assuming that the Trustee can prove every allegation of the Complaint, neither the Sixth nor Seventh Claims for Relief states a claim upon which relief could be granted. The Trustee has not alleged a transfer of property of the Debtor to HPC. Instead, he merely alleges that the Debtor fraudulently transferred his shares to his children, continued to maintain possession and control of the shares and the corporation and that it was a mere instrumentality for the Debtor. If all that is true, the claims, if any, must be against the shareholders to recover the shares and to recover the assets of the corporation through more conventional collection channels, such as dissolution of the corporation. C.R.S. §§ 7–114–106, 107 and 108. This remedy would afford the corporation's creditors the traditional protections. The Trustee cannot bypass these conventional legal mechanisms of reaching the corporation and its assets by simply asserting alleged misconduct on the part of the Debtor, the president of the corporation.

In addition, the facts outside the pleadings regarding the corporate formalities observed by HPC, which are established by the Affidavit of Lawrence E. Hamilton ("Hamilton Affidavit"), do not compel a different result. In fact, they corroborate the Court's conclusion. The Hamilton Affidavit supplements the Complaint regarding Hamilton's relationship with HPC. Specifically, Hamilton attests that he is the President of HPC and has served in that capacity since 1976 to the present, that he served as a member of HPC's Board of Directors and that he is familiar with the history and operations of HPC. HPC was established under Articles of Incorporation dated July 15, 1976, a copy of which is attached to the Hamilton Affidavit. In addition, Hamilton appended a copy of the Certificate of Incorporation signed by the Secretary of State of the State of Colorado dated July 16, 1976. A list of all the meetings and what the Debtor attests are representative samples of the minutes of those meetings are attached. HPC operates under Bylaws, a current copy of which is also attached to the Hamilton Affidavit.

In addition, the Debtor attests regarding the following corporate formalities:

1. HPC maintains records of all stock issued and transferred, and retains copies of the canceled stock certificates as well as copies of share certificates presently outstanding. The current holder of 1,490 shares, comprising 100% of the outstanding shares in HPC, is Edward M. Heppenstall who holds such shares pursuant to a Voting Trust Agreement dated April 11, 1992, a copy of which is Attachment 9 to the Affidavit. Attachments 10 and 11 to the Affidavit are copies of Voting Certificate for Capital Stock No. 1 and Voting Certificate for Capital Stock No. 2, respectively.

2. HPC operates on a fiscal year commencing on July 1 and ending on June 30. Federal and State Income Tax Returns have been filed by HPC for the fiscal year ended June 30, 1977 and each year thereafter to and including June 30, 1994.

3. HPC currently maintains, and has maintained since shortly after its inception a complete set of financial records kept on a monthly basis.

4. HPC has in the past maintained and currently possesses a business license issued by the City of Aurora's Revenue Division.

5. HPC is, and has been continuously since the late 1970's, a licensed real estate broker in the State of Colorado.

6. HPC has in the past and continues to file biennial reports with the Colorado Secretary of State so as to remain in good standing as a Colorado corporation.

7. HPC has been the maker of several promissory notes evidencing funds borrowed from banks including First Interstate Bank, Century Bank and Union Bank & Trust.

8. HPC has had four or more employees since 1991 and payroll records are maintained on a monthly basis for such employees. As of March 30, 1993, HPC had five employees: Janelle M. Griest, Joyce Kay Hoppal, Tammy Perea, Gary A. Freeman and the Debtor.

9. HPC currently withholds and, since its inception, has withheld FICA and State and Federal Income Tax from employee wages and prepared on a monthly basis reports of same.

10. HPC pays Unemployment Insurance taxes for its employees and files reports of same.

11. HPC provides Worker's Compensation Insurance for its employees.

12. HPC maintains a bank escrow bank account as required by the rules and regulations of the Colorado Real Estate Commission and receives monthly bank statements of same.

13. HPC maintains a bank account for its business operations and receives monthly bank statements for same.

14. A significant portion of HPC's business includes the leasing and fee management of commercial office buildings and, accordingly, HPC from time to time has entered into leasing and management agreements with owners of commercial office buildings.

15. HPC engages in real estate brokerage earning sales commissions for the sale of commercial and residential properties.

16. HPC is a member of the National Association of Realtors, the Colorado Association of Realtors and the Aurora Association of Realtors. It is a past member of the Denver Board of Realtors. HPC has maintained such affiliations from approximately 1979 to the present. HPC is also an approved broker for the U.S. Department of Housing and Urban Development (HUD).

17. HPC has its own stationery, business cards and facsimile transmittal forms.

Regarding his personal affairs, the Hamilton Affidavit establishes that:

1. Hamilton individually maintained his own personal records, finances, and had his own personal real estate and business investments apart from those of HPC. He held his personal funds in bank accounts other than those of HPC and filed his own personal income tax returns.

2. Hamilton was an officer and employee of HPC from its inception and there was in

effect at all times an employment agreement governing his relationship to HPC.

3. Hamilton maintained his own personal residence and paid his own mortgage or rent payment at all times. For the past twelve years he resided in an apartment subject to a lease agreement with the apartment owners. He held in his own name certain investments, for the most part real estate equity interests. He attests that the ownership of these interests, and the others listed in his Petition, were distinct and separate from the assets of HPC and were not commingled with HPC's funds or assets.

Lastly, Hamilton attests in his Affidavit as to the allegations of collusive foreclosure:

1. Hamilton owned land at 2520 W. 23rd Avenue, Denver, Colorado, commonly known as Baby Doe's Matchless Mine Restaurant until January, 1992. The land was subject to a long term land lease with a subsidiary of Specialty Restaurants Corporation. He valued the land at about $700,000 as of January 1992. There were liens against the property at that time in excess of $1 million and the foreclosure of the property satisfied certain debts of his personal estate, specifically: National Traveler's Life Insurance Note having a balance of about $251,000; Cherry Creek National Bank Note having a balance of about $232,000; and Lorraine J. Hamilton Notes credited in the amount of $100,000. There were in excess of $400,000 in junior liens that were extinguished by the foreclosure of the Baby Doe's property because of the failure of such lienholders to exercise rights of redemption.

2. Hamilton owned an undivided one-half interest in land at 9350 Grant Street, Thornton, Colorado, commonly known as Brittany Hill Restaurant until foreclosure occurred in May 1992. The land was subject to a long term land lease with a subsidiary of Specialty Restaurants Corporation. He values the land at about $250,000 as of that date. There were liens against such interest at that time in excess of $1 million. The foreclosure of the property satisfied his personal debts on account of the Lorraine J. Hamilton Notes in the

amount of about $872,000. There were in excess of $200,000 in junior liens that were extinguished by the foreclosure of the Brittany Hill interest because of the failure of such lienholders to exercise rights of redemption.

Trustee's Memorandum of Law in Opposition to Hamilton Defendants' Motion to Dismiss and for Summary Judgment with Respect to Claims Six through Nine Asserted Against Hamilton Properties Corporation ("Trustee's Opposition") appends the affidavit of an attorney, one of the Trustee's counsel. That attorney attests that she has received certain documents in response to discovery requests both formal and informal. Those documents allegedly obtained are attached but they are not supported by the testimony of anyone in any form which can establish any type of foundation for the documents submitted. In fact, the Trustee's Opposition, with rare exception, is merely a reiteration of the Complaint without support meeting the requirements of Rule 56. It is replete with the conclusions about the Trustee's theory of the case but there are simply no, or grossly insufficient, facts offered in support of his theory. He certainly has not refuted the facts established by the Hamilton Affidavit nor has he demonstrated by Trustee's Opposition that there are genuine issues for trial. Yet, it is his burden as the plaintiff who will have the burden on the dispositive issues at trial, to go beyond the pleadings and, by affidavits, or by the "depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

What the Hamilton Affidavit establishes is that HPC observed the corporate formalities, had employees, paid taxes and maintained a real estate broker's license. HPC has also demonstrated that the Debtor kept separate books and records, maintained his own bank account, held separate investments and filed his own tax returns. Even presuming and accepting as true that the Debtor was the controlling influence and decision maker for HPC, that he, through HPC, orchestrated the transfer of assets among entities and that

there may have been commingling of assets, these allegations are not at all dissimilar to those which the Tenth Circuit expressly rejected as forming a basis for disregarding the corporate entities in *Cascade.* In *Cascade,* the Tenth Circuit noted that the district court decision was based on

> three key factual findings: (1) Weston (the promoter) dominated the boards of directors and the management of the four entities; (2) Weston was "single-handedly" able to transfer assets among the various entities and did so; and (3) Weston commingled the funds of the various entities in the sense that when he transferred funds from one entity to another, the funds were deposited in the receiving entity's general bank account and were mixed with other funds there. *Id.* at 1576.

The Circuit agreed that the record in the case supported the findings made by the district court. "But the issue is whether those facts constitute sufficient grounds for disregarding the entity status of the entities in this case." The court found they were not. The factors it considered in so concluding are instructive:

> Although the promoter used his entities to further his personal objectives, just as corporate parents often use their subsidiaries to achieve corporate goals, (the promoter) held the entities out to the world as separate organizations. No one disputes that (the promoter's) entities were validly organized and that de jure formation requirements were met. Indeed, (one entity) was publicly held.... The entities filed separate tax returns. The entities held separate shareholder and director meetings. In sum, the district court made no finding that the entities did not maintain the external incidents of separateness.
> ... [E]ven if (the promoter's) entities failed to comply with all the formalities that they should have and even if (he) did freely transfer funds among the entities, claimants have not shown how their injury was connected with the entities' commingling or lack of formalities or how the claimants relied on the entities' separateness or the lack thereof. As the Utah corporate veil test demonstrates, it is not enough to

declare that two corporations or a corporation and its prime shareholder are not really separate. The claimant must show that recognition of the corporate form would sanction a fraud, promote injustice, or [produce] an ·inequitable result.

But the "injustice" or "inequity" on which a piercing claim is based cannot stem from the mere existence of limited liability, which is a legitimate characteristic of the corporate form. Rather, the "injustice" or "inequity" to the claimant must be connected with the lack of separateness between the corporation and its controlling shareholder and the failure to observe corporate formalities. *Cascade Energy and Metals Corp. v. Banks,* 896 F.2d at 1578.

Having concluded that the Trustee has failed to state a claim under his Sixth Claim for Relief, his Seventh Claim for Relief, which is premised on a finding that HPC is the alter ego of the Debtor, necessarily fails as well. Accordingly, this Court concludes that the Trustee's Sixth and Seventh Claims for Relief fail to state a claim upon which relief can be granted and ARE HEREBY DISMISSED.

### *RENT ASSIGNMENT CLAIMS*

HPC's primary defense to the Trustee's Eighth and Ninth Claims for Relief is that they are barred by the statute of limitations imposed by 11 U.S.C. § 546, specifically that the Trustee failed to file this action within two years following his appointment. The file and the record in this case establish that the Debtor filed his bankruptcy case on March 19, 1993. The notice of the section 341 meeting of creditors, which issued on March 24, 1993, advised that Jeffrey A. Weinman was the Interim Trustee. A Notice of Appointment of Interim Trustee dated March 30, 1993, was filed with the Court on March 31, 1993. That Notice advised that

> Unless another trustee is elected at the meeting of creditors held pursuant to 11 U.S.C. Section 341, the interim trustee shall serve as trustee without further appointment or qualification. The interim trustee shall be deemed to have accepted the appointment unless the interim trustee notifies the Court and the United States

Trustee in writing of rejection within five (5) days after receipt of notice of appointment.

The section 341 meeting of creditors was held on April 23, 1993, and the Complaint in this adversary case was filed on April 21, 1995.

■ It is the position of HPC that the section 546 statute of limitations runs from the appointment of an interim trustee, not from the section 341 meeting of creditors. The Trustee, on the other hand, maintains that the time period should run from the section 341 meeting of creditors at which time his position becomes permanent.

Section 546 of the Code applicable to this case reads as follows:

An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—(1) two years after the appointment of a trustee under section 702 ... of this title; or (2) the time the case is closed or dismissed.

Section 702 of the Code, to which section 546 explicitly refers, speaks to the election of a trustee at the meeting of creditors held under section 341. Particularly, that section dictates that "if a trustee is not elected under this section, then the interim trustee shall serve as trustee in the case."

The section 546 limitations period has been the source of significant debate but the majority of courts have followed the view espoused by the Trustee. *In re Art & Co., Inc.*, 179 B.R. 757, 761 (Bankr.D.Mass.1995). Very recently, in a well articulated and persuasive opinion, the bankruptcy judge in *Art & Co.* concluded that the majority view is the better view.

There are two rationales that support the majority view. First and foremost, Section 546(a)(1) expressly and plainly refers to the appointment of a permanent trustee under Section 702 and not the appointment of an interim trustee under Section 701. Secondly, the role of the interim trustee is

that of a caretaker as his duties and tenure are restricted under Section 701.

This Court adopts the rationale pronounced, especially with respect to the explicit language of section 546(a)(1) and its reference to section 702 and not 701, and concludes, that the Complaint was timely filed.

■ With respect, then, to the substance of the Eighth and Ninth Claims for Relief, HPC secondarily argues that the Rent Assignment Claims are meritless because HPC returned the entire economic benefit of the assignment to the Debtor through accounting credits. What is evident is that HPC does not dispute the essential facts which are alleged in the Complaint.[3] Rather, HPC's argument is in the nature of an affirmative defense as to which it carries the burden of proof at trial.

■ HPC points out that it appears as though HPC received a net benefit of $20,000.00, but that the issue is whether, because "the entire economic benefit of the transaction" was restored to the Debtor through the accounting credits a year later (described in the affidavit of Kenneth A. McCarty, a CPA and the accountant for HPC and the Debtor), the transfer should not be set aside. The Trustee observes succinctly that HPC's position is stated without any supporting legal authority. The Court makes the same observation and finds that, without more, what HPC has proffered does not provide grounds for the grant of summary judgment in HPC's favor nor is it sufficient to shift the burden to the Trustee to come forward with evidence in support of the elements of his case. Accordingly, the Motion for Summary Judgment on this issue must be DENIED.

### CONCLUSION

The Court has considered the arguments of the parties as presented in the Motion to Dismiss and for Summary Judgment, with Memorandum Brief[4] and the file in this case

---

**3.** The undisputed facts regarding the Rent Assignment are set forth in paragraphs 44–48 on page 9 above.

**4.** Various legal theories have been argued by the parties in the pleadings. Although this opinion

does not explicitly address each of them, that should not be construed to mean they were not considered. Rather, the various positions were considered and rejected or not considered as dispositive or necessary to a resolution of the Motion.

and, in accordance with the foregoing findings and conclusions, it is hereby

ORDERED, that the Motion to Dismiss and for Summary Judgment, with Memorandum Brief IS GRANTED as to the Sixth and Seventh Claims for Relief of the Complaint and the Trustee's Sixth and Seventh Claims for Relief ARE DISMISSED; and it is

FURTHER ORDERED, that the Motion to Dismiss and for Summary Judgment, with Memorandum Brief as to the Eighth and Ninth Claims for Relief of the Complaint IS DENIED; and it is

FURTHER ORDERED, that the Eighth and Ninth Claims for Relief are reserved for a trial in this case, and the Court will issue a separate order setting the matter for trial before the undersigned judge.