**BROWN MACKIE COLLEGE,**
Plaintiff–Appellant,

v.

**Gene P. GRAHAM, Jr.; Graham & Graham, P.C., Defendants– Appellees.**

**No. 91–3321.**

United States Court of Appeals, Tenth Circuit.

Dec. 16, 1992.

Barry W. McCormick (James J. Cramer with him on the briefs) of Payne & Jones,

Chartered, Overland Park, KS, for plaintiff-appellant.

John J. Jurcyk, Jr., (Daniel F. Church of McAnany, Van Cleave & Phillips, and Gene P. Graham, Jr. of White, Allinder, Grate & Graham, Independence, MO, with him on the briefs), Kansas City, KS, for defendants-appellees.

Before SEYMOUR, MOORE, and TACHA, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

In this appeal, plaintiff Brown Mackie College seeks to reverse an order of summary judgment entered in favor of defendant, Gene P. Graham, Jr., in its action for tortious interference with contract. 768 F.Supp. 1457. The district court found that even if plaintiff could show Mr. Graham interfered with Brown Mackie enrollment contracts, his actions were privileged by the attorney-client relationship. Despite Brown Mackie's crafting the issue as one of first impression requiring us to draw a bright line between properly counselling clients and tortiously interfering with their contracts, plenary review stops far short of that destination. Even while viewing the entire record through plaintiff's lens and indulging all possible inferences in its favor, we cannot find a triable issue and affirm.

### I.

Brown Mackie operates a proprietary business college and offers a program of court reporting at its two campuses in Salina and Overland Park, Kansas. In 1986, Brown Mackie sued Pamela Fennelly, a student enrolled in the court reporting program, for breach of the enrollment agreement she had signed and sought payment of unpaid fees. In that state action, Ms. Fennelly retained an attorney, Mr. Graham, who asserted a counterclaim for damages based on fraud and misrepresentation. To prepare for trial, Mr. Graham contacted several past and present Brown Mackie court reporting students whom he intended to call as witnesses. However, Ms. Fennelly and Brown Mackie settled the case before trial, and the action was dismissed.

At about the same time, Brown Mackie instituted a second similar collection action against another student who also retained Mr. Graham. Given the proximity in time between the two cases and the information he had already gathered in his preparation of the Fennelly case, Mr. Graham instructed his secretary to call those present and former Brown Mackie students who had expressed similar dissatisfaction with the program to inform them he would hold a meeting on February 20, 1988, to discuss their rights with relation to a possible legal action against Brown Mackie. Mr. Graham's secretary made the calls, contacting students who wanted to air their grievances and others who were not interested in attending or suing Brown Mackie.

Mr. Graham called a second meeting at his office on April 16, 1988, attended by many students who were present at the first session, additional students present for the first time, and Shelly Gasper, an attorney with the Kansas Attorney General's office who was investigating Brown Mackie for alleged violations of the Kansas Consumer Protection Act.[1] Ms. Gasper distributed complaint forms for students to submit to her office. Ms. Gasper also attended a third meeting at Mr. Graham's office and told students interested in pursuing their grievances to withhold payment until the matter was resolved. Between January and April 1988, approximately thirty-five students withdrew from the court reporting program. Subsequently, Brown Mackie filed this action against Mr. Graham for tortious interference with contract.[2]

---

1. A year later, Brown Mackie signed an Assurance of Voluntary Compliance negotiated with the office of the Attorney General of Kansas and agreed to rectify those areas of conduct in which the school violated the Kansas Consumer Protection Act.

2. Although Brown Mackie initially filed the case in Kansas state court, Mr. Graham, a Missouri citizen, removed it to federal court.

Memorializing Brown Mackie's theory that Mr. Graham interfered with existing contracts, the pretrial order identified fifteen students who had quit school as a result of Mr. Graham's alleged conduct and listed actual damages of $27,217.22 in relation to those enrollment contracts. Additionally, Brown Mackie alleged other students breached their contracts although those breaches did not result in financial loss to the school. Key to its theory was, Brown Mackie claimed, evidence of certain "cold calls," calls made during the week of February 15, 1988, to students who had never signed a list, expressed any interest in suing the school, or had any prior relationship with Mr. Graham. However controverted the evidence of other contacts may have been, Brown Mackie contended these cold calls fully demonstrated Mr. Graham crossed the line between permissibly advising clients and tortiously interfering with contracts.

The district court disagreed, concluding none of Brown Mackie's submissions showed Mr. Graham "induced any of the fifteen students listed in the pretrial order to breach their contracts with plaintiff." The court rejected Brown Mackie's attempt to connect the telephone calls and meetings to the "unprecedented" drop-out rate experienced in the spring term of 1988.[3] Moreover, the district court found Mr. Graham was justified in contacting potential witnesses and individuals connected with his investigation and at all relevant times was practicing his profession which conferred a privilege upon him that immunized his actions.

## II.

■ Brown Mackie's appeal is premised on a fundamental misunderstanding of summary judgment under Fed.R.Civ.P. 56(c).[4] What emerges from a synthesis of plaintiff's argument is the proposition that the nonmoving party's disputing a material fact is sufficient to overcome summary judgment. Were this the rule announced in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), we would have to conclude Brown Mackie survived the motion for summary judgment based on its bare assertion in the brief that it controverted 33 of defendant's 71 "uncontroverted" facts and submitted 23 additional facts to which defendant never responded. (Appellant's Brief at 14). However, *Anderson* provides no such tally sheet.

Instead, the dispute about a material fact must be *genuine*, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. This inquiry, the Court added, "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252, 106 S.Ct. at 2512. In short,

> [i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* (emphasis added).

■ When Brown Mackie's burden of proof under Kansas substantive law[5] is set

---

**3.** The record contains no comparative enrollment figures or other evidence to demonstrate the spring 1988 drop-out rate was unprecedented.

**4.** Rule 56(c) states in part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**5.** The parties do not challenge the court's holding Kansas law applies to the tortious interference with contract claim.

against this standard, we must ask whether there is a genuine dispute about a material fact necessary to establish Mr. Graham, without legal privilege to do so, induced or otherwise intentionally caused a third person not to perform a contract with another. *International Union, (UAW) v. Cardwell Mfg. Co.*, 416 F.Supp. 1267, 1290 (D.Kan.1976). Under *Cardwell*, Brown Mackie must present evidence of (1) the existence of a contract between plaintiff and students; (2) knowledge of the contract on defendant's part; (3) an intentional interference with these known contract rights without legal justification; and (4) resulting damage to plaintiff. *Id.* Only the third element is contested; however, Brown Mackie contends it sufficiently met its burden here to warrant a trial. We disagree.

■ As the district court noted, of the fifteen students Brown Mackie alleged had quit school as a result of Mr. Graham's tortious conduct, not one stated in the depositions offered that Mr. Graham had anything to do with the decision to stop attending court reporting classes. Indeed, most of the students stated their decisions were based on dissatisfaction with the program, for example, quality of the teaching, availability of classes, and confusion over course requirements. Sharon Hunter, who stopped attending classes in December 1986, stated she and other students asked Mr. Graham to hold a meeting after learning of the Fennelly case. Other students testified they called Mr. Graham's office for directions after being told of the meeting by fellow students. Sue Drew, Carol Sue Lane, Donna Byerley, Cecelia Harrison, and Laurie Smith, named among the fifteen students, stated in their depositions they quit Brown Mackie before the February 20th meeting. Laurie and Bill Slaughter stated in affidavits they contacted Mr. Graham and quit because they were dissatisfied with the program. Cherri Germany, who stopped attending classes on May 16,

1988, described her dissatisfaction with the quality of the teachers, stating she felt she was not making any progress in the program. In her letter to Brown Mackie, she stated, "I've been instructed by Shelly Gasper from the attorney general's office not to pay you any money." (Appellant's Appendix at 369). Other students also stated Ms. Gasper told them at the May meeting they could stop payments on their enrollment contracts. In sum, not one of the fifteen students said Mr. Graham called and induced the subsequent breach of contract.

Nevertheless, Brown Mackie urges the district court made too much of this facet of proof, ignoring the fact that at the time of the depositions, Mr. Graham represented each student. Brown Mackie contends what these fifteen students testified to is not the issue, but "the real question is ... [whether] plaintiff presented evidence upon which a jury could reasonably find that Graham induced these students to breach their enrollment agreements through his entire course of conduct." That entire course of conduct, Brown Mackie insists, can only be gleaned from all of the circumstantial evidence arising from "the web of interactions" between the act of solicitation and the actual advice to breach the contract. This evidence, Brown Mackie contends, satisfies its Rule 56(c) burden.

For example, Brown Mackie cites Debora Randolph's deposition in which she stated Mr. Graham's secretary called her although she had never attended a meeting, signed any list, or expressed any interest in suing the school. Ms. Randolph testified she told the caller she was not interested. Mr. Graham later contacted Ms. Randolph, asking her to come to his office to answer an interrogatory, and telephoned again requesting she inform him if she received a subpoena from Brown Mackie. Ms. Randolph completed the court reporting program.[6]

---

6. In its brief, Brown Mackie cites to that portion in the deposition in which Ms. Randolph "testified that, when she saw Germany at the store, Germany told her she had breached her contract with BMC because Gene Graham told her

to and that she was told by Mr. Graham to quit paying BMC." (Appellant's Brief at 17–18). In her deposition, Ms. Randolph answers the question, "No, I saw her in the grocery store and I don't know how it got started but she said she

 

We are at a loss to understand how this testimony or the circumstantial evidence arising from this testimony could alter or affect Brown Mackie's burden in responding to defendant's motion for summary judgment. While the evidence may present an alleged disputed fact, that alone cannot overcome a properly supported motion for summary judgment. "By its very terms, this standard [of Rule 56(c)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510.

In addition, Brown Mackie's discrediting the testimony of the fifteen students it targeted in the action because they retained Mr. Graham to represent them only begs the question. The position now taken by Brown Mackie belies its unilateral allegation that these students were induced to breach their contracts. For Brown Mackie to predicate its case upon that assertion but now argue the students are unworthy of belief calls into question its own credibility.

■ Moreover, if these fifteen students were clients at that time, Mr. Graham's advice was privileged by the attorney-client relationship. Although the district court analyzed Mr. Graham's conduct and professional relationship with the students, and plaintiff invites us to probe that conduct behind the defense of attorney-client privilege,[7] we do not believe the record requires we even reach that question. Albeit we adopt the district court's analysis under the Restatement (Second) of Torts, §§ 767, 770 (1977), and Kansas case law.[8] The district court correctly concluded Mr. Graham's professional conduct circumscribed by his investigating the Fennelly and Dennis cases and preparing the proposed class action was not improper.

Finding Brown Mackie is unable to direct us to any "facts that might affect the outcome of the suit under the governing law," *id.* at 248, 106 S.Ct. at 2510, we hold the district court properly denied Brown Mackie's motion to reconsider its order granting summary judgment in favor of Mr. Graham. We therefore AFFIRM.

---

had been contacted by Gene Graham and he had told her—she didn't say breach her contract but he said don't pay Brown Mackie and she had gone to some meetings and she did drop out of school and she hasn't paid back her loans." (Appellant's Appendix at 515).

7. We do not address the various ethical violations Brown Mackie raised for the first time in

this appeal or other allegations not in the record. *Pell v. Azar Nut Co.,* 711 F.2d 949 (10th Cir.1983).

8. Brown Mackie's reliance on *Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978), is misplaced.