**Susan K. MART, Plaintiff,**

**v.**

**DR PEPPER COMPANY, Pepsi–Cola General Bottlers, Inc., and Gary Terrell, Defendants.**

**Civ. A. No. 95–2043–EEG.**

United States District Court,
D. Kansas.

April 2, 1996.

As Corrected April 22, 1996.

William S. Robbins, Jr., The Robbins Group, L.L.C., Kansas City, MO, for plaintiff.

John A. Vering, III, Dianne M. Hansen, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Michael F. Delaney, Denise D. Clemow, Spencer, Fane, Britt & Browne, Kansas City, MO, John H Quinn, III, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on summary judgment motions filed by defendants Pepsi–Cola General Bottlers, Inc. ("Pepsi") and Gary Terrell (Doc. # 44), and Dr Pepper Company (Doc. # 56). For the reasons set forth below, the motions will be granted.

*Factual background*

The following is a summary of uncontroverted facts or facts deemed admitted, pursuant to Federal Rule of Civil Procedure 56(c) and District of Kansas Rule 56.1, or facts considered in the light most favorable to plaintiff.

Plaintiff Susan K. Mart was employed by Dr Pepper in 1987 as an account sales manager. She was responsible for working with bottling plants and arranging to have Dr Pepper products placed on soft drink dispensing machines for retail sale. Plaintiff was the account manager for Dr Pepper's account with Pepsi's Olathe bottling facility, where her principal contact was the on-premises manager. On July 1, 1993, defendant

Gary Terrell became the on-premise manager of the Olathe Pepsi facility.

Plaintiff alleges that defendant Terrell made several inappropriate comments with sexual connotations, while in his position as on-premise manager for Pepsi. Specifically, she alleges that he referred to his secretary as a "bitch." Plaintiff did not respond to this comment. On another occasion, plaintiff alleges that Terrell stated that he would "like to give her a big, sloppy, wet kiss." Plaintiff stated that the comment was "gross."

In October 1993, plaintiff scheduled an 8:00 a.m. meeting with Terrell. When plaintiff went to Terrell's office for the meeting, he stated, "what the fuck do you want?" Plaintiff replied that she did not "want to be here either." Plaintiff also alleges that she has overheard Terrell ask employees who come into his office, "what the fuck do you want?"

Plaintiff alleges that at a meeting with Terrell on December 9, 1993, when she commented that he looked tired, Terrell responded that "he was having ... teenage girl problems at home" and that the level of female hormones at his house were "too high." He commented that one could "just look at girls the wrong way and they would begin to cry" and that he wished that girls could be more like men. Plaintiff responded, "thank goodness we all grow out of it."

In her deposition, plaintiff described Terrell's demeanor between October and December 15, 1993, as "wonderful and happy, upbeat, not a problem." However, on December 15, 1993, plaintiff and Terrell met to write a joint memo requesting that Dr Pepper hire an associate account sales manager for small accounts in Kansas City. During this meeting, Terrell referred to a female representative as a "cunt." Plaintiff responded by putting her hands up, palms out, and said, "no" and shook her head. Terrell rolled his eyes and chuckled.

Later that day, Terrell complained to plaintiff that plaintiff's boss, Larry Tipp, had used the "f" word in every sentence during a phone conversation. Plaintiff called Larry Tipp and reported the December 15, 1993, conversation to him because she wanted to inform Tipp that there was a "bad situation

out there." Plaintiff was concerned that Terrell might complain about Tipp and warned Tipp to tone down his language. Plaintiff does not controvert that she did not ask Tipp or anyone else at Dr Pepper or Pepsi to take any action against Terrell at that time.

In late December 1993, plaintiff had separate discussions with two Pepsi employees who worked for Terrell. They reported that Terrell has asked that his secretary be taken on a sales call at the Platinum club, a strip bar. Plaintiff did not discuss the sales call with Terrell's secretary. However, the next time plaintiff talked to Terrell, she brought up the sales call and stated that she found it "really inappropriate." Plaintiff was offended by the sales call because it was "humiliating to a female." Plaintiff alleges that Terrell responded that his secretary would have to learn to call on that type of account if she wanted to be a sales representative and that no one would take his secretary seriously because she wore "fuck me pumps."

Plaintiff's next contact with Terrell occurred on January 7, 1994, when she had a phone conversation with him about funding for a Diet Dr Pepper program, which required Pepsi to devote one of the valves on its on-premise equipment to Diet Dr Pepper. Plaintiff had been working on this program for a long time and it was very important to her. Because Diet Dr. Pepper cost Pepsi more per gallon to produce and distribute than other products, Dr Pepper agreed to fund the program for two years to encourage Pepsi to try the program. Plaintiff alleges that Terrell became angry about the limited funding and said, "You're not going to fuck me and fuck me, get on top of me, get me pregnant and leave me." Plaintiff hung up on Terrell. Plaintiff understood Terrell's comments to mean that he did not want to be "left out in the cold with a program that's half funded."

In tears, plaintiff called her boss, Larry Tipp, and told him about her conversation with Terrell. Tipp encouraged her to call Dr Pepper's human resources department. Tipp claims that he called Terrell and discussed the situation, but Terrell denies receiving any such call from Tipp.

After talking with Tipp, plaintiff called Anne Weston, Associate Manager of Employee Relations for Dr Pepper, that same day to complain about Terrell. Weston gave plaintiff three options for dealing with the situation: (1) ignore the problem; (2) write a letter to Terrell with help from Dr Pepper; or (3) have Dr Pepper management talk with Pepsi management about the situation. On January 10, 1994, plaintiff told Weston that she preferred the option of management talking to management. Plaintiff told Weston that she did not want to get Terrell in trouble, she just wanted him to stop the foul language in her presence. Plaintiff claims that Collin Quigley, Director of Human Resources for Dr Pepper, called her and told her that he did not believe that her allegations constituted sexual harassment because Terrell's conduct did not involve solicitation for sex.

In any event, Dr. Pepper arranged for Dr Pepper's Zone Vice President, Michael Nugent, and Tipp to meet with Terrell to discuss the situation. Plaintiff rejected this approach and told Nugent that she did not want anyone from Dr Pepper talking directly to Terrell. Plaintiff wanted Dr Pepper management to by-pass Terrell and go directly to Pepsi management, so as to spur an investigation of Terrell's conduct. Plaintiff felt that direct confrontation of Terrell by Dr. Pepper officials would adversely affect her sales. Plaintiff told Nugent that if direct confrontation was to be Dr Pepper's approach, she would handle it herself.

Plaintiff requested that Tipp attend a two-day training meeting with Pepsi personnel in mid-January 1994 because she was concerned about being alone with Terrell without management support. Tipp agreed but, due to a scheduling conflict, only stayed for a short period. A male account manager from St. Louis attended the meeting with plaintiff. Terrell was not present at the meeting.

On January 31, 1994, plaintiff had a conversation with Pepsi's human resources representative, Emonia Barnett, about Terrell. Barnett asked plaintiff not to discuss the Terrell matter with anybody, including Terrell, and to call her if plaintiff needed to tell her anything else.

Immediately following her conversation with Barnett, plaintiff went to Terrell's office and confronted him. Plaintiff walked in Terrell's office and made a "joke" about never being late "unless of course I'm called in by human resources." Plaintiff then stated that she felt he was "unprofessional, immature, [and] that there was a lack of respect." Plaintiff told Terrell that he needed to tone down his language. Terrell asked plaintiff about different words, including "fuck" and "shit," and whether she was offended by them. Plaintiff cut him off, believing that he was not taking her seriously. Terrell commended plaintiff's "strength and professionalism" and told her that it took courage to stand up to him. They shook hands and agreed to work together. Plaintiff has described Terrell as "very nice" and "cordial" at the close of the meeting.

Plaintiff went home and immediately called Barnett and told her that she felt "a little bit more comfortable and that [she and Terrell] had cleared the air." Plaintiff told Barnett that she did not want to see Terrell fired, but just wanted him to "wake up and smell the coffee."

There were no further incidents of foul language by Terrell between January 7, 1994, and the date when plaintiff left Dr Pepper's employment in February 1994. Plaintiff's only other contact with Terrell occurred on February 4, 1994. Terrell approached plaintiff and asked her how she had been feeling over the last few days since she confronted him. Plaintiff told Terrell she was "fine" and Terrell responded, "good." Plaintiff believed that Terrell was being sarcastic.

On February 17, 1994, plaintiff notified Dr Pepper that she was resigning, effective February 25, 1994. Plaintiff was an employee-at-will in that there was no written employment agreement between plaintiff and Dr Pepper. Plaintiff's last day of employment at Dr Pepper was February 25, 1995. At the time plaintiff resigned, her supervisors knew of no reason to terminate her employment. Plaintiff was not experiencing any performance-related problems. Indeed, by all accounts, plaintiff was an excellent performer—

she had been rated "highly satisfactory" in her 1992 and 1993 performance reviews and would have been eligible for a merit salary increase in 1994 if she had not resigned. After plaintiff tendered her resignation, Dr Pepper discussed account sales positions in Los Angeles and Phoenix with her, but plaintiff did not accept either position.

On February 4, 1994, Gil Cassagne of Dr Pepper contacted Bob Bauer, Terrell's boss. Cassagne informed Bauer that plaintiff was going to file an EEOC charge against Dr Pepper, Pepsi, and Terrell and expressed concern about any possible deterioration in the relationship between Dr Pepper and Pepsi. Bauer assured Cassagne that the relationship would not be affected by the plaintiff's claims and did not express any displeasure with plaintiff or Dr Pepper. Mr. Bauer did not suggest any course of action to Dr Pepper regarding plaintiff's complaint. No other conversations took place between officials for Dr Pepper and Pepsi, or Dr Pepper and Terrell, regarding the Terrell/Mart matter, until after plaintiff resigned from her job.

In December 1993 a sexual harassment complaint was filed against Terrell by a Pepsi employee, Cathy Wright. The complaint involved an alleged incident where, after observing Ms. Wright leave the office of another Pepsi employee, Terrell allegedly went into the employee's office and, referring to Ms. Wright, said "are you fucking that?" Pepsi investigated the complaint and issued Terrell the following written reprimand:

> After investigating the allegation of sexual harassment, you are being reprimanded. Your language and behavior have been inappropriate and poor judgment has been exercised as demonstrated by a lack of sensitivity to females and failing to approach your subordinates in the appropriate manner.
>
> You are being advised to exercise discretion and professionalism in your demeanor when dealing with your staff, females and other employees of the Company. You are also being directed to call the Employee Assistance Program (EAP) office for the scheduling of sessions in regard to this issue....

> Please be aware that retaliation of any type will not be tolerated.
>
> If further instances of this nature should arise, further discipline will be administered including termination.

On January 27, 1995, plaintiff filed the instant suit alleging claims for hostile work environment in violation of Title VII against defendant Dr Pepper (Count I), negligent supervision and retention against defendant Pepsi (Count II), intentional infliction of emotional distress against all three defendants (Count III), and tortious interference with contract against defendants Pepsi and Terrell (Count IV). Defendants now seek summary judgment on plaintiff's claims.

*Discussion*

*Standards Governing Summary Judgment.*

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Essentially, the inquiry as to whether an issue is genuine is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at

2510. This inquiry necessarily implicates the substantive evidentiary standard of proof that would apply at trial. *Id.* at 252, 106 S.Ct. at 2512.

Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D.Kan. Rule 206(c).

With respect to plaintiff's state law claims, we ascertain and apply Kansas law with the objective that the result obtained in federal court should be the same result that a Kansas court would reach. *See Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992). Ever mindful of these summary judgment standards, we now turn to the merits of defendants' motions.

*Claim for Hostile Work Environment Sexual Harassment.*

Defendant Dr Pepper seeks summary judgment on plaintiff's Title VII sexual harassment hostile work environment claim, on the ground that Terrell's conduct did not, as a matter of law, create a hostile work environment cognizable under Title VII. Courts have interpreted Title VII to prohibit two types of sexual harassment: quid pro quo sexual harassment and hostile work environment sexual harassment. Plaintiff claims that Terrell's language subjected her to the second type of sexual harassment, that of a hostile work environment.

Hostile work environment harassment occurs when sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citing 29 C.F.R. § 1604.11(a)(3)). To prevail under a hostile environment theory, plaintiff must present evidence of sexual conduct which "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1419 (10th Cir.1993). To be actionable under Title VII, sexual harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. at 2405). Hostility is determined under the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.,* 507 U.S. at ——, 114 S.Ct. at 371. Psychological harm suffered by plaintiff is also relevant, although not required. *Id.*

Notably, Terrell was not Dr Pepper's employee. Liability for non-employees

is "both an emerging issue in the federal courts and, it appears, an [sic] question of first impression in the Tenth Circuit." *Otis v. Wyse,* No. 93–2349–KHV, 1994 WL 566943, at *6 (D.Kan. August 24, 1994). In *Otis,* this court adopted 29 C.F.R. § 1604.11(e) (1993) as the standard by which employer liability for a hostile environment created by a non-employee is measured. 29 C.F.R. § 1604.11(e) provides as follows:

> An employer may ... be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

This standard parallels that set forth in *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 577 (10th Cir.1990), for employer liability for harassment perpetrated by a nonsupervisor employee. Under both, the employer is liable, not for the harassment in the first instance, but for negligence in failing to end the harassment after being made aware of it.[1]

■■■■ As an initial matter, we question whether Terrell's offensive language rises to the level of actionable hostile environment sexual harassment. We certainly do not condone Terrell's crude language and we sympathize with plaintiff in being offended by it. Nevertheless, while Terrell's language is highly inappropriate in the workplace and may well have offended plaintiff, under the facts of this case, Terrell's crude language alone does not amount to sexual harassment. There are no allegations that Terrell ever touched or otherwise physically threatened plaintiff. Likewise, there are no allegations that Terrell ever invited or pressured plaintiff to have sex or go on a date with him. As discussed by the court in *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995), Title VII is not designed to "purge the workplace of vulgarity," but to "protect working women from the kind of male attentions that can make the workplace hellish for

women." A "merely unpleasant working environment," even that which includes "occasional vulgar banter, tinged with sexual innuendo," is simply not actionable. *Id.* at 431. Indeed, cases with more egregious circumstances than those presented here have been found to fall short of stating an actionable claim for sexual harassment. *See, e.g., Baskerville,* 50 F.3d at 430–31 (reversing jury finding of harassment); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594–96 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995) (reversing jury finding of harassment); *Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1192 (D.Kan.1995).

■■■■ Even assuming that Terrell's language did create a hostile work environment, Dr Pepper is not liable because, upon learning of the alleged harassment against plaintiff, Dr Pepper took prompt, adequate and effective action to remedy the situation. *See, e.g., Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989); *Swentek v. US AIR, Inc.,* 830 F.2d 552 (4th Cir.1987). What is reasonable in terms of remedial action depends on the gravity of the alleged harassment. *Baskerville,* 50 F.3d at 432. The uncontroverted facts here indicate that once plaintiff complained about Terrell's language during the January 7, 1994, phone conversation, Dr Pepper responded appropriately. Plaintiff does not controvert that Tipp called Terrell regarding his language. Notwithstanding Collin Quigley's alleged indication to plaintiff that her complaint did not equate with sexual harassment, it is uncontroverted that Dr Pepper made immediate arrangements to have Michael Nugent and Tipp meet with Terrell. Those plans were cancelled when plaintiff rejected this approach and said she would handle it herself. Whether as a result of Tipp's phone call or plaintiff's confrontation of Terrell on January 31, 1994, plaintiff does not allege any further instances of foul language or any other alleged sexual harassment by Terrell between January 31, 1994, and her resignation on February 17, 1994. Plaintiff alleges only

---

**1.** The analysis differs when the harasser-employee is a supervisory employee who uses his or her position of authority to commit the harassment.

In that instance, the employer is strictly liable, regardless of knowledge. *See Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993).

that Terrell spoke sarcastically to her on February 4, 1994. We do not believe that sarcasm gives rise to a claim for sexual harassment, even considering Terrell's earlier offensive comments.

We conclude that there exists no genuine issue of material fact regarding whether Dr Pepper took adequate steps to "remedy a hostile or offensive work environment," once it knew of Terrell's conduct toward plaintiff. Plaintiff's allegations that Dr Pepper "abandoned her" by failing to take the remedial action plaintiff requested, are simply not borne out by the record. Dr Pepper is entitled to judgment as a matter of law on plaintiff's Title VII claim.

*Tort of Outrage.*

All three defendants seek summary judgment on plaintiff's tort of outrage claim because they contend that, even taking all of plaintiff's factual allegations as true, plaintiff cannot make out a cognizable claim for the tort of outrage. We agree. In Kansas, the threshold for a tort of outrage claim is substantial and is only surmounted in the rare cases of significantly egregious circumstances.

■■■ To prevail on her outrage claim, plaintiff must present evidence of the following elements: (1) the conduct of the defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981). "Liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Taiwo v. Vu,* 249 Kan. 585, 592–93, 822 P.2d 1024, 1029 (1991).

■■■ Courts have been reluctant to permit an outrage claim relating to sexual harassment arising in the employment setting. *See Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990) (citations omitted). Plaintiff invites us to lower the threshold required, with respect to her claim against Pepsi and Terrell, because it was outside the employment setting and she does not have a Title VII claim against them. We decline the invitation. We believe that, regardless of the context, in Kansas, recovery for the tort of outrage requires outrageous conduct. Plaintiff's outrage claim fails as a matter of law because Terrell's conduct, while offensive, was not so extreme and beyond the bounds of all decency that the law must intervene.

*Negligent Supervision and Retention.*

■■■ Defendant Pepsi seeks summary judgment on plaintiff's claims for negligent supervision and retention of Terrell. Kansas law clearly recognizes a claim by non-employee third parties for negligent supervision and retention. *See Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 503 (D.Kan. 1994); *Kansas State Bank & Trust Co. v. Specialized Transp. Serv., Inc.,* 249 Kan. 348, 362, 819 P.2d 587, 598 (1991).

■■■ To go forward with her negligent supervision and retention claim, plaintiff must present evidence from which a reasonable jury could find that Pepsi was negligent in retaining Terrell after it knew or should have known of his alleged harassment of plaintiff. Liability for negligent supervision and retention is not vicarious liability under the doctrine of respondeat superior, but is direct liability which lies when an employer has "reason to believe that an undue risk of harm to others [will] exist as a result of the employment of the alleged tortfeasor." *Kansas State Bank,* 249 Kan. at 362, 819 P.2d at 598. Liability is limited to any harm caused that was within the foreseeable risk. Foreseeability may only be determined as a matter of law "when reasonable persons could arrive at but one conclusion." *Id.*

■■■ Plaintiff's negligent supervision and retention claim fails for several reasons. First, there is no evidence that any harm was actually caused by Pepsi's retention of Terrell as an employee—as we have held elsewhere in this opinion, Terrell did not commit a tort against plaintiff. Second, even if Terrell's language could amount to sexual

harassment, the uncontroverted evidence is that Pepsi was first put on notice of Terrell's conduct when Cathy Wright filed her complaint in December 1993. The uncontroverted evidence supports the conclusion that Pepsi responded promptly and appropriately by investigating Wright's allegations and, upon completion of its investigation (which included an interview with plaintiff regarding her interactions with Terrell), by issuing Terrell a written reprimand. Significantly, Terrell's conduct ceased. Under the uncontroverted facts of this case, we hold as a matter of law that Pepsi was not negligent in its supervision or retention of Terrell.

*Tortious Interference with Contract.*

In Kansas, one who induces or otherwise intentionally causes a third person not to perform a contract may be liable for tortious interference with that contract. *Brown Mackie College v. Graham,* 768 F.Supp. 1457, 1460 (D.Kan.1991), *aff'd,* 981 F.2d 1149 (10th Cir.1992) (citing *Baruch v. Beech Aircraft Corp.,* 175 F.2d 1, 3 (10th Cir.), *cert. denied,* 338 U.S. 900, 70 S.Ct. 251, 94 L.Ed. 554 (1949)). Kansas also recognizes a tort for intentional interference with a prospective contract, business relationship or advantage. *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986).

To establish a cause of action for tortious interference with an existing contract, plaintiff must demonstrate: (1) the existence of a contract with Dr Pepper; (2) knowledge of the contract by defendants; (3) an intentional interference with the known contract rights without legal justification; and (4) resulting damage to plaintiff. *Brown Mackie,* 768 F.Supp. at 1460–61. Defendants Pepsi and Terrell move for summary judgment on plaintiff's claim for tortious interference with contract, claiming that plaintiff may not bring such a claim because plaintiff had no employment contract with Dr Pepper. *See Johnson v. Wefald,* 766 F.Supp. 977, 984 (D.Kan.1991) (an at-will employee cannot state a claim for tortious interference with contract). We agree.

Plaintiff bases her tortious interference claim on an alleged implied employment contract with Dr Pepper. Citing *Conyers v. Safelite Glass Corp,* 825 F.Supp. 974 (D.Kan. 1993), plaintiff argues that a jury could find that an implied employment contract existed based on plaintiff's longevity with Dr Pepper and her good work performance. We have serious doubts about the validity of plaintiff's argument. Plaintiff's claim of an implied employment contract appears much more grounded in her own unilateral expectation on continued employment than in facts evidencing an implied employment contract. *See Conyers,* 825 F.Supp. at 977 (unilateral expectation of employment cannot give rise to an implied employment contract).

Moreover, even assuming that plaintiff has raised a factual question about the existence of an implied employment contract, her claim must fail. Simply put, there is no evidence that Pepsi or Terrell interfered with or induced the breach of any such contract. Plaintiff voluntarily resigned from her position. *See Gentry v. Hopkins,* Civ. A. No. 87–4327–S, 1989 WL 161439, at *4 (D.Kan. December 19, 1989) (plaintiff who resigned cannot establish tortious interference with contract).

Plaintiff contends that Terrell's harassment amounted to a constructive discharge. To establish constructive discharge, plaintiff must present evidence from which the jury could find that "a reasonable [person] would view the working conditions as intolerable." *Hirschfeld,* 916 F.2d at 580 (quoting *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986)). To prove constructive discharge based on alleged sexual harassment, plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Prod.,* 968 F.2d 427, 430 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The uncontroverted evidence in this case does not support a finding of constructive discharge—Dr Pepper had taken corrective action and the alleged harassment had ceased when plaintiff resigned. *See id.* We conclude that a reasonable person in plaintiff's position would not have felt compelled to resign under the circumstances. *See Hirschfeld,* 916 F.2d at 580.

Accordingly, even if plaintiff could establish an implied employment contract, she cannot establish intentional interference with it by defendants.

IT IS THEREFORE ORDERED that the summary judgment motion by defendants Pepsi and Terrell (Doc. # 44) is granted as to all claims.

IT IS FURTHER ORDERED that the summary judgment motion by defendant Dr. Pepper (Doc. # 56) is granted as to all claims.