COBANK, ACB, Plaintiff,

v.

The REORGANIZED FARMERS CO-OPERATIVE ASSOCIATION, and FCA Post–Confirmation Trust, Defendants.

No. 02–1300–JTM.

United States District Court, D. Kansas.

Sept. 9, 2004.

Gail S. Greenwood, Michael Kip Maly, Winston & Strawn, San Francisco, CA, Martin R. Ufford, Redmond & Nazar, L.L.P., Wichita, KS, for Plaintiff and Defendants.

Thomas D. Haney, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, for Defendant and Claimants.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on plaintiff CoBank's motion for summary judgment on defendant Farmers Cooperative Association's amended counterclaims. For the reasons stated below, the court grants plaintiff's motion for summary judgment as to all counterclaims. The court finds the material facts as follows.

### I. STANDARD

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the

material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. FINDINGS OF FACT

This action arises from a loan agreement between CoBank and the Farmers Cooperative Association (currently, The Reorganized Farmers Cooperative Association and the FCA Post–Confirmation Trust referred to as "FCA").

CoBank is an agricultural lending bank chartered as a federal instrumentality under the Farm Credit Act of 1971. On or about January 31, 2000, FCA and CoBank entered a Master Loan Agreement ("MLA"), which was subsequently amended on August 2, 2000. Under the MLA, FCA had a revolving loan and term loan, referred to as the "Statused Revolving Credit Supplement" and the "Revolving Term Loan Supplement". Section 10(A) of the Amendment to the MLA provides that FCA must maintain a working capital of $1 million at the end of each fiscal year, which was July 31.

On Thursday, September 21, 2000, FCA's accountants presented a preliminary audit which indicated a current operating loss of approximately $1.6 million for the fiscal year, and a violation of the working capital covenant under the MLA. Prior to the audit, FCA reported working capital of $1.7 million. After the audit, FCA's working capital for the 2000 fiscal year end was only $102,363. FCA provided a copy of the preliminary audit to CoBank on the following day. The parties are in dispute as to whether CoBank restricted or froze FCA's line of credit after obtaining the audit report, but on September 25, 2000, the next business day, CoBank sent a letter of default on the note.

As of Sunday, September 24, 2000, FCA's president had scheduled a meeting to occur the following morning with bankruptcy attorneys. On Monday, September 25, 2000 at approximately 9:00 a.m., FCA's President, CFO, Board Chairman, and legal counsel met at FCA's office with bankruptcy attorneys from the law firm of Lentz & Clark for approximately four hours. The bankruptcy attorneys discussed the time frame, and indicated that if FCA was going to file bankruptcy they needed to do so in a timely manner.

On Monday, September 25, 2000, an FCA employee requested and received approval from Dennis Blick, a CoBank credit manager, of an advance to FCA of $60,000 for payment of a margin call on grain. It is not clear whether the letter of default had been received before Mr. Blick approved the advance. Later that same day, at approximately 7:30 p.m., the FCA Board of Directors held a special meeting. At the meeting, Tim Elliott suggested that the Board retain the law firm of Lentz & Clark to handle the filing of bankruptcy. The following morning the Board met with the attorneys from Lentz & Clark and discussed the possibility of filing for bankruptcy.

While the exact timing is in dispute, both parties agree that on Tuesday, September 26, 2000, Mr. Dumler requested approval from Mr. Blick of CoBank to advance $4,056,969.95 to FCA, which was reported to be for payment of grain, freight, and payroll. On a conference call

on the same day, CoBank declined to advance the funds.

On Wednesday, September 27, 2000, FCA filed Chapter 11 bankruptcy in the United States District Court of Kansas, Kansas City Division.

## III. ANALYSIS

FCA filed an amended counterclaim against CoBank for (1) breach of written contract, (2) breach of oral contract, (3) fraud, (4) breach of duty of good faith and fair dealing, (5) breach of fiduciary duty, and (6) tortious interference with contract.

### A. Breach of Written Contract

■ As to the claim of breach of written contract, the language of the MLA controls. The agreement required FCA to maintain at the end of the fiscal year a working capital of $1 million, a requirement which was not met based on the audit report CoBank received on September 22, 2000. At this point, CoBank had the option of either waiving the working capital requirement as it had done in the past or to declare FCA in default. Although the parties disagree as to whether CoBank restricted or froze the line of credit on September 22, 2000, this fact is not dispositive. CoBank could elect its remedy following FCA's default. CoBank's decision on September 25, 2000, to advance $60,000 was within its discretion, and CoBank did not waive its other remedies by doing so. Thus, CoBank was within its rights to deny FCA an advance of $4 million on September 26, after notifying FCA of the default on the previous day.

■ FCA argues that in ten instances from 1998–2000 CoBank had waived the working capital requirement, and FCA had received single day advances of $1.5—$2 million. Prior waivers, however, do not bind CoBank in this situation, particularly when the amount requested is twice as much as any previous advance. Further-

more, it is not clear whether the terms of the agreements before January 1, 2000, were the same as those of the present MLA agreement or whether bankruptcy was an issue in the prior instances where CoBank gave advances. Regardless, CoBank did not issue a waiver of the working capital requirement and instead issued a letter of default on September 25, 2000. Since FCA dropped its oral contract argument, it is not relevant what Mr. Dumler, FCA's CEO, believed to be the implication of the letter of default.

From the FCA Board's action, FCA did not seem assured that it would be able to get the additional funds from CoBank or any other lender as its officers had begun discussions with bankruptcy attorneys before the $4 million request to CoBank had been made.

As to the dispute as to whether Colorado or Kansas law controls, the court does not need to reach this issue. The finding that FCA breached its working capital covenant with CoBank is dispositive. Any remedy sought under the MLA is within CoBank's legal right. Thus, summary judgment should be granted in favor of CoBank.

### B. Breach of Oral Contract

FCA abandoned its claim of breach of oral contract, and thus the court finds summary judgment in favor of CoBank. The court does not reach the choice of law question as to whether Kansas or Colorado law applies.

### C. Fraud

■ FCA also alleges fraud in its discussion of punitive damages. To prove fraud, FCA must establish (1) a false representation of material fact, (2) that the representation was known to be false, or recklessly made, (3) that the representation was intentionally made for the pur-

pose of inducing FCA to rely upon it, (4) that FCA reasonably relied upon the representation, and (5) that FCA suffered damage by relying on the representation. *See, e.g., M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380 (Colo.1994). The Tenth Circuit has previously recognized that a party claiming fraud "cannot turn an action for breach of contract into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriments from its breach." *Brown v. Chaffee,* 612 F.2d 497, 503 (10th Cir. 1979). The alleged fraud must be independent from, and not governed by, the parties' loan agreement. *See Atchison Casting Corp. v. Dofasco, Inc.,* 889 F.Supp. 1445, 1460–1463 (D.Kan.1995) (summary judgment granted regarding alleged misrepresentations that were the subject of asset purchase agreement).

■ FCA in its discussion does not set forth facts to demonstrate a genuine issue for trial for the elements of fraud. Instead FCA restates its allegations that CoBank falsely represented that it would fund grain purchases, pay utilities and payroll which it claims induced FCA to incur these bills. These facts merely repeat FCA's allegations for breach of oral contract, which FCA has already abandoned. FCA does nothing to set forth and prove the elements of fraud as an independent claim. Thus, summary judgment must be granted in favor of CoBank.

## D. Breach of Duty of Good Faith and Fair Dealing

As to FCA's claim that CoBank breached a duty of good faith and fair dealing, the court grants summary judgment in favor of CoBank. The court will look at the issue of good faith and fair dealing as a separate claim, even though FCA merged this discussion with that of breach of written contract.

■ Both parties cited to *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.,* 872 P.2d 1359 (Colo.App.1994) as important to determining whether there was a breach of good faith and fair dealing. FCA notes that the Colorado court acknowledged that every contract, including written credit agreements, "contains an implied duty of good faith and fair dealing." *Id.* When conduct as a whole violates this duty, the debtor is entitled to recover damages for the loss sustained. *Id.* CoBank notes that *Wells Fargo* states that the standard of good faith does not impose obligations beyond the contract. *Id.* at 1363 ("The duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provision.").

As set forth by the facts, FCA initially breached its duty under the MLA by not maintaining the required working capital as the audit report revealed. On the business day following receipt of the audit report, CoBank issued a letter of default to FCA. The default notice was given in a timely manner following the bank's own internal meeting. Since FCA dropped its claim of an oral contract with CoBank, the issue is straightforward. CoBank was in its discretion to decline an advance of $4 million to a defaulting-borrower. To claim otherwise would contradict the terms of the MLA. Thus, summary judgment is granted in favor of CoBank.

## E. Breach of Fiduciary Duty

As to FCA's claim that CoBank breached its fiduciary duty, the court finds that CoBank maintained an arm's length distance and preserved its lender-borrower relationship.

■■ In an actionable breach of fiduciary duty claim, there are four elements:

(1) the existence of a fiduciary relationship, (2) a duty arising out of the fiduciary relationship, (3) a breach of the duty, and (4) damages proximately caused by the breach of duty. *F.D.I.C. v. Grant,* 8 F.Supp.2d 1275, 1299 (N.D.Okla.,1998). Damages are an essential element of a breach of fiduciary duty claim. *Id.*

■ The facts indicate CoBank maintained a creditor-borrower relationship with FCA, which did not rise to the level of a fiduciary relationship. Like any bank, CoBank must maintain some level of oversight of its borrower to ensure its investment. Requirements of written approval for certain transactions, limitations on use of funds and inquiry into business activities are a normal part of a bank's monitoring of its investment. CoBank's activities were in the normal course of business and do not rise to the level of a fiduciary duty. Thus, summary judgment will be granted in favor of CoBank.

**F. Tortious Interference with Contract**

■ As to FCA's claim that CoBank tortiously interfered with its contracts with farmers, the court finds that such allegations are without merit. The elements of the claim of tortious interference with an existing contract are (1) the existence of a contract between the plaintiff and a third party; (2) knowledge of the contract on the defendant's part; (3) intentional interference with known contract rights without legal justification; and (4) resulting damage to the plaintiff. *Brown Mackie College v. Graham,* 768 F.Supp. 1457, 1460 (D.Kan.1991) *aff'd* 981 F.2d 1149 (10th Cir. 1992). In Kansas, a party, who without legal privilege to do so, intentionally causes a third person not to perform a contract with another may be held liable for tortious interference with that contract. *Id.*

■ Based on its written agreement with FCA, CoBank placed FCA in default because FCA's audit revealed that it had not met the requirements of the working capital covenant. Thus, it was within CoBank's legal rights to refuse to advance an additional $4 million. As courts have held, a party is entitled to enforce the terms of a contract, even to the discomfort of the other party and its creditor. *See, e.g., Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1357–58 (7th Cir.1990). There is no showing that CoBank's refusal was illegal or improper. Thus, summary judgment must be granted in favor of CoBank.

It is accordingly ordered this 9th day of September, 2004, that the plaintiff's motion for summary judgment on all counterclaims (Dkt. No. 121) is granted.